

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 269 | **DATE** | 3/26/2003 |
| **CASE TITLE** | Penny Gentieu, et al vs. Tony Stone Images/Chicago, Inc., et | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. No genuine issue of material fact preserves any of Gentieu's myriad claims against an adverse judgment as a matter of law. Getty's Rule 56 motion is granted it its entirety and this action is dismissed. (64-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials
SN

number of notices

MAR 2 6 2003
date docketed

AJR
docketing deputy initials

3/26/2003
date mailed notice

SN
mailing deputy initials

U.S. DISTRICT COURT
FILED
03 MAR 26 PM 3: 01
Date/time received in central Clerk's Office

**Document Number**

102

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PENNY GENTIEU, et al.,                )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )    No.  00 C 269
                                      )
TONY STONE IMAGES/CHICAGO, INC.,      )
et al.,                               )
                                      )
                Defendants.           )

<u>MEMORANDUM OPINION AND ORDER</u>

Photographer Penny Gentieu and her corporation Penny Gentieu

Studio, Inc (collectively "Gentieu," hereafter treated for

convenience as a singular feminine noun) have brought this action

against Tony Stone Images/Chicago, Inc. ("Stone") and Getty

Images, Inc. (defendants are collectively referred to as "Getty,"

also treated as a singular noun), charging (1) copyright

infringement, (2) breach of fiduciary duty and (3) breach of

contract.  Getty has filed a Fed. R. Civ. P. ("Rule") 56 motion

for summary judgment, and both sides have complied with this

District Court's LR 56.1.[1]  For the reasons contained in this

_____

[1] LR 56.1 is designed to facilitate the resolution of Rule
56 motions by requiring evidentiary statements and responses to
such statements (in each instance with record citations), thus
highlighting the existence or nonexistence of factual disputes.
This opinion cites to Getty's LR 56.1(a)(3) statement as "S. St.
¶ --," to Gentieu's LR 56.1(b)(3)(B) statement of additional
facts as "G. St. ¶ --," to Gentieu's Response to Getty's LR
56.1(a)(3) statement as "G. Resp. ¶ --" (although where an S. St.
assertion is not contradicted, a citation to the latter
ordinarily suffices) and to Getty's reply statement as "S. R. St.
¶ --."  This opinion employs the same "S." and "G." abbreviations
in referring to the parties' exhibits and memoranda.



memorandum opinion and order, Getty's motion is granted in its entirety and this action is dismissed.

## Summary Judgment Standards

Familiar Rule 56 principles impose on parties moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). And <u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986)

> A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

As with any summary judgment motion, this Court accepts nonmovant Gentieu's version of any disputed facts, but only so long as it is supported by record evidence. What follows in the <u>Background</u> section is culled from the parties' submissions in that fashion.

## Background

Gentieu is a professional photographer specializing in images of babies (S. St. ¶4). On September 30, 1993 Gentieu entered into a contributor's agreement (the "1993 Contract") with

Stone, a stock photography agency[2] (id. ¶5). Under the 1993 Contract Gentieu appointed Stone as her exclusive agent for licensing images that she submitted and Stone accepted (id.). When she signed the 1993 Contract, Gentieu was aware that Stone also accepted images of babies from other photographers (id.). Stone was acquired by Getty Images, Inc. in 1995, and it is now a wholly-owned subsidiary (S. St. ¶1).

Gentieu began taking photographs of babies in 1985, using a specific technique to create images that made the baby appear as though it were floating in white space (id. ¶43). For that purpose Gentieu shot the babies (centered directly under her camera) from overhead, with the baby positioned on plexiglass that was over diffused light (G. St. ¶8). That lighting eliminated the baby's shadow, making the baby appear as if it glowed or floated and resulting in a background that has been described as "high white" (id., S. Ex. 114 at 37-38). In 1993 Gentieu also began to create photocompositions by using a computer to combine several photographic baby images digitally into a single image (S. St. ¶44, G. St. ¶41).

Gentieu, like every photographer under contract with Getty, was assigned an art director to whom she submitted images that

---

[2] That term describes an organization that accepts images from multiple photographers and licenses those images to customers (such as publishers and advertisers) who do not wish to commission the creation of new images for particular uses (S. St. ¶9).

would be accepted into the Getty collection of images at Getty's discretion (S. St. ¶14). Once accepted, an image was "duped" and filed in the Getty collection, and in later years[3] images were "keyworded" and added to Getty's computerized research system called Compass (id. ¶15). In response to a request from a Getty customer for a certain type of image, the collection would be searched and a menu of image choices would be provided to the customer (id. ¶31). After reviewing those choices, the customer would communicate with a Getty account executive to advise as to its image selection and to negotiate the price and other terms and conditions of the license (id. ¶32). Images were often combined by customers with text and in ways that were not specified in the terms of the license (id. ¶33).

In addition to the initial review of photographers' images, art directors also helped to suggest and identify concepts for photographers to shoot (id. ¶13). Art directors sent shoot briefs to the photographers that communicated Getty's research findings about photographic trends and customer needs to identify potential new markets (id.). Those shoot briefs routinely contained ideas and art direction for new images as well as "tear sheets," rough photographs conveying the basic concept behind a proposed assignment (id.; see, e.g., S. Ex. 25).

---

[3] When Getty switched to the computerized system is disputed by the parties (G. Resp. ¶26), but the timing of that process has no material impact on the analysis here.

Throughout her contract with Getty, Gentieu received such shoot briefs and ideas for images from her art director (id. ¶¶67, 148). In particular, in September 1996 she was sent a memorandum listing suggestions for baby images such as "baby shot straight on silhouettable clean white background" and referring to one of her earlier images as a best seller (G. St. ¶37, G. Ex. 4).

Without reference to Gentieu's images, Getty art directors gave similar shoot briefs and discussed ideas for baby images with other Getty photographers, including six photographers based in London (collectively the "London photographers"): Vincent Oliver ("V. Oliver") (S. St. ¶110), David Oliver ("D. Oliver") (S. St. ¶120, S. R. St. ¶¶516-17), Tim Brown ("Brown") (S. R. St. ¶446), Andrew Hall ("Hall") (S. St. ¶130, S. R. St. ¶¶527-28), Andrew Olney ("Olney") (S. St. ¶141, S. R. St. ¶¶497-99) and Stuart McClymont ("McClymont") (S. St. ¶147, S. R. St. ¶¶474, 476-78). That resulted in a number of baby images taken by those photographers and photocompositions made from their baby photographs also being accepted into the Getty collection. In May 1998 Gentieu's art director sent her a memorandum that listed new shoot ideas for non-baby images and certain baby images that Getty no longer needed at that time, including "babies in silhouette, white backgrounds" (G. St. ¶86).

Over the years Getty accepted over 200 of Gentieu's images

that were licensed in approximately 7000 transactions generating over $850,000 in realized revenue (id. ¶6). Under the 1993 Contract Gentieu received 50% of all money collected from licenses issued in North America and 30% of the money collected from licenses issued abroad (S. St. ¶¶56-57). Against those amounts, the costs of producing printed catalogs were charged back to Gentieu from sales of her images that had been selected by Getty to appear in those catalogs (id. ¶73). Sales revenues for Gentieu's images varied widely depending on the image (id. ¶7). Payments to Gentieu were to be made on a cash accounting basis (id. ¶77).

Gentieu acknowledges that she made a lot of money from her images through Getty but counters that her revenues declined in the later years of the relationship (G. Resp. ¶6). While sales of her images peaked in 1997, her revenues per picture did not grow at the same rate as they had in the first three years of her contract (id.). In 1998, while Getty accepted more of Gentieu's images than in previous years, sales per image dropped (id.). Gentieu's revenues continued to decline in 1999 and 2000 (id.).

According to Gentieu, that decline in sales and revenues from her images was due to Getty's approach to licensing her images. On that score she charges that Getty commissioned, accepted and licensed images of babies taken by photographers other than Gentieu, did not pursue unpaid and unlicensed uses,

allowed increased cancellations of Gentieu's images, gave price discounts for her images and keyworded her images improperly (G. Resp. ¶95).

In the late 1990s Getty was implementing plans to create a website and to allow digital delivery of images (S. St. ¶72). At the same time contract revision discussions were under way between Getty and members of the Photographers Advisory Group ("PAG"), a rotating group of Getty photographers that was set up to provide input and advice to Getty and to address concerns of the general photographer population (S. St. ¶72, S. R. St. ¶¶102, 105). In those discussions Getty sought to standardize its agreements with its submitting photographers and to develop a contract that addressed the new issues raised by web licensing (S. R. St. ¶188). Newsletters sent to Getty photographers, including Gentieu, mentioned the new agreement as early as July 1997, and in January 1998 discussed the need for a standard commission split for on-line sales (S. Exs. 50, 85).

By August 1998 Getty developed a framework for the new contract ("1998 Contract") that was sent to Gentieu along with a cover letter on August 3 (S. St. ¶74, G. St. ¶94). In addition to a number of other changes, the 1998 Contract reduced the royalty percentage for on-line sales to 40% and changed to an accrual basis for payment, under which photographers would receive payments within 120 days after the license was issued,

whether or not the customer had paid (S. St. ¶¶75-76, 78). Two incentives for signing the 1998 Contract were identified in the cover letter: (1) those who signed would receive a lump sum payment from the switch to accrual accounting and (2) their photos would be on the website at its launch (G. St. ¶94).

Gentieu refused to sign the 1998 Contract and communicated her objections to Getty (S. St. ¶82). She joined with a group of other photographers (known as the "G40") who objected to the new contract and hired counsel to negotiate modifications (id. ¶83). Although at its launch Getty's website did not include images by members of the G40, during the contract negotiations their images, including Gentieu's, were placed on the web (G. Resp. St. ¶84). By spring 1999 most of the G40 had reached an agreement with Getty, but Gentieu refused to sign the modified contract and declined Getty's offer to terminate her 1993 Contract by consent (S. St. ¶¶86-88, G. St. ¶188). Although Gentieu believes that her images should have remained on the web under the 1993 Contract (G. St. ¶¶189, 97-99), Getty removed Gentieu's images from its website because she had not signed the 1998 Contract (S. St. ¶89, S. R. St. ¶189).

In March 2001 Getty exercised its right under the 1993 Contract to terminate Gentieu (S. St. ¶91). Getty waived its right under the 1993 Contract to re-license or extend licenses for Gentieu's images for five years and began to remove her

images from its licensing system (G. St. ¶375).

As stated earlier, Gentieu has sued Getty for copyright infringement, breach of fiduciary duty and breach of contract. First she alleges that many of the baby images in the Getty collection taken by the London photographers or created from their photographs, as well as images by three United States photographers (Ed Honowitz ("Honowitz"), Philip Condit ("Condit") and Eric Tucker ("Tucker")), infringe her copyrighted images. Relatedly she argues that Getty's practices in licensing her images exceeded the scope of the 1993 Contract and therefore constitute infringement. Second, Gentieu asserts that Getty's relationship with the London and other photographers along with its failure to promote her images electronically, its claimed withholding of contract renegotiation information and its licensing practices breached Getty's fiduciary duty as Gentieu's agent. Third, Gentieu contends that all of the conduct by Getty that forms the basis of her other claims constituted breaches of either specific provisions of the 1993 Contract or its "best efforts" clause, or of an implied covenant of good faith and fair dealing. Getty responds that all of those claims fail as a matter of law. This opinion addresses the claims in turn.

## Copyright Infringement

Gentieu urges that Getty violated her rights under the copyright laws in two ways. First, it copied, distributed and

made derivatives of her images and caused or commissioned the London and other photographers to do so. Second, its conduct in licensing Gentieu's images exceeded the scope of its licensing agreement.

## Alleged Copying of Gentieu Images

Gentieu contends that Getty commissioned photographs of babies from the London and other photographers and participated in the creation of baby images from those photographs that infringed on her copyrighted works. <u>Susan Wakeen Doll Co. v. Ashton-Drake Galleries</u>, 272 F.3d 441, 450 (7th Cir. 2001) quotes the test set out in <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.</u>, 499 U.S. 340, 361 (1991):

> To establish copyright infringement, a plaintiff must prove two elements: "1) ownership of a valid copyright, and 2) copying of constituent elements of the work that are original."

Gentieu's ownership of valid copyrights in her images is uncontested, but the parties disagree about the second element: whether Getty copied or directed other photographers to copy 15[4] of Gentieu's copyrighted images.

Because direct evidence of copying is typically unavailable,

---

[4] Gentieu's responsive memorandum and her LR 56.1(b)(3)(B) statement of additional facts (incorporating the "Gentieu Declaration") identifies 18 images as purportedly infringing those 15 images (in different combinations). Although those works by Gentieu are just a subset of the images that Getty has addressed, this opinion discusses only those raised by Gentieu, who as the party bringing this action defines the universe of claimed infringement.

"copying may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work" (Susan Wakeen, id., quoting Atari, Inc. v. N. Am. Philips Consumer Elec. Corp., 672 F.2d 607, 614 (7th Cir. 1982)). Because Gentieu offers no direct evidence, she must try to establish a prima facie case of infringement by demonstrating (1) that Getty and the photographers who created the allegedly infringing images had access to her images and (2) that the works they created are substantially similar to her copyrighted works.

In turn, such a prima facie case raises a presumption of copying that can then be rebutted by defendant's showing that the allegedly infringing works were independently created (Susan Wakeen, id.). If as a matter of law the similarities between works are insufficient to prove copying, or if it is established that the accused work was independently created without copying, Gentieu cannot prevail (Wildlife Express Corp. v. Carol Wright Sales, Inc., 18 F.3d 502, 508 (7th Cir. 1994)).

1. Access

For prima facie purposes Gentieu has raised a reasonable inference that Getty and its photographers had access to her works. Proof of access can be established by demonstrating that the creators of the allegedly infringing works had the "opportunity to view the protected item" (id. at 508 n.5). Further, Selle v. Gibb, 741 F.2d 896, 901 (7th Cir. 1984) has

11

explained that access can be established by evidence that the copyrighted work was sent to a close associate of the defendant or that the material was widely disseminated.

Under those principles Getty's argument that the photographers never viewed her works may fall short--if only in the Rule 56 inference-drawing context. Getty's own access to the Gentieu's images is undisputed: Gentieu's submitted images were accessible in all of Getty's worldwide offices. And it may perhaps be reasonable to infer access on the part of the photographers. At least several of Gentieu's protected images were included in Getty catalogs that were available for review by Getty photographers. Moreover, the Getty art directors had close working relationships with submitting photographers that involved regular communications about photographic needs and shooting ideas. As a result of their close association with Getty, it may be inferred arguendo at this stage that the other photographers had an "opportunity to view the protected item[s]."

2. <u>Substantial Similarity</u>

But Gentieu falls at the second essential hurdle-- substantial similarity--as to which her evidentiary efforts require a much more in-depth analysis. Substantial similarity is determined by applying the ordinary observer test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant

12

unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value" (<u>Wildlife Express</u>, 18 F.3d at 509, quoting <u>Atari</u>, 672 F.2d at 614).

Atari, <u>id</u>. has endorsed a substantial similarity inquiry that compares the "total concept and feel" of the works rather than an analytic dissection of their differences. But <u>Atari</u>, <u>id</u>. at 615 also made clear that "the ordinary observer test, in application, must take into account that the copyright laws preclude appropriation of only those elements of the work that are protected by copyright." And so any comparison of images must be preceded by an analysis of the scope of Gentieu's copyrights to identify what elements are included in her protected expression (as <u>Sweet v. Chicago</u>, 953 F. Supp. 225, 229 (N.D. Ill. 1996) has put it, "the 'total concept and feel' analysis may be applied only after the scope of copyright protection is determined").

It is axiomatic that copyrights protect the expression of ideas but not the ideas themselves (<u>Feist</u>, 499 U.S. at 349-50; 17 U.S.C. §102(b)). <u>Feist</u>, <u>id</u>. at 348 also teaches that originality is the sine qua non of copyright, so that protection extends only to an author's <u>original</u> expression of an idea.

It follows that for photographs a copyright does not extend to the subject matter of the image itself, but instead protects the expression of the subject as contained in such elements of

13

the author's composition as the selection of lighting, shading, camera angle, background and perspective (Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60 (1884); Wallace Computer Servs., Inc. v. Adams Business Forms, Inc., 837 F.Supp. 1413, 1417 (N.D. Ill. 1993)). Although in some cases the contrived positioning of a subject has been protected (see, e.g., Burrow-Giles, 111 U.S. at 60), the poses are not copyrightable elements where they follow necessarily from the choice of the subject matter or are otherwise unoriginal (Kaplan v. Stock Market Photo Agency, Inc., 133 F.Supp.2d 317, 324-25 (S.D. N.Y. 2001); Int'l Biotical Corp. v. Assoc. Mills, 239 F.Supp. 511, 513 (N.D. Ill. 1964)("copyrights cannot monopolize the various poses used in these photographs since its copyrights can protect only Plaintiff's particular photographic expression of these poses and not the underlying ideas therefor").

It takes only a little thought to recognize, and this Court holds, that Gentieu cannot claim a copyright in the idea of photographing naked or diapered babies or in any elements of expression that are intrinsic to that unprotected idea. Clearly the "poses" at issue in Gentieu's images capture the natural movements and facial expressions of infants, as opposed to the contrived or directed positioning of a photographic model. Such poses are implicit in the very idea of a baby photograph and are

not proper material for protection under Gentieu's copyrights.[5]
It is not enough to establish infringement that the accused
photographs were of naked babies in various poses.  Rather
Gentieu must show that the accused images are substantially
similar to particular compositional elements of her expression
that do not necessarily flow from the idea of photographing naked
babies.

It is of course possible in appropriate cases that the
substantial similarity of copyrighted and allegedly infringing
works can devolve into a fact-intensive inquiry requiring a
trial.  But the non-trial alternative of summary judgment is the
appropriate route where the court "concludes either that any
similarity between the works concerns only noncopyrightable
elements or that no reasonable jury could find the works
substantially similar" (Wavelength Film Co. v. Columbia Pictures
Indus., Inc., 631 F. Supp. 305, 306 (N.D. Ill. 1986)).  Where as
here the works are attached to the parties' submissions, the
court may make a visual comparison of the images to determine as
a matter of law whether they are substantially similar to
copyrightable material (Theotokatos v. Sara Lee Personal Prods.,
971 F. Supp. 332, 340-41 (N.D. Ill. 1997)).

_____

[5]    It may well be true that, as Gentieu claims, capturing a
baby's pose is a skill that has served her well (G. Resp. ¶160).
But the poses themselves (e.g., a baby's smile or a baby putting
up its arms) are inseparable from the unprotectible idea of a
baby photograph.

15

Gentieu's 15 assertedly infringed images fall into three groups: (a) close-up head shots of naked babies on white backgrounds, (b) digital photocompositions of baby photographs and (c) images of a frightened child in a corner. Those will be compared to the purportedly infringing works.

(a) Close-up head shots

First Gentieu says that four of her close-ups of naked babies are infringed by eight photographs taken by other Getty photographers and accepted into the Getty collection.[6] Each of Gentieu's protected images is of a naked baby's head, neck and shoulders shot using diffused lighting so as to appear on a "high white" background.

Getty argues correctly that because Gentieu's images reflect only the idea of a photograph of a naked baby, her copyright in them is limited to protecting against exact replication of her images. It is true that exact copying or near identity of expression is generally not necessary to establish copyright infringement (Wildlife Express, 18 F.3d at 511). Some ideas, however, can be expressed only in a limited number of ways, and

---

[6] Using the numbering system provided by the parties, Gentieu charges: (1) McClymont's image BB7591-002 (DX 35) and V. Oliver's images BB2449-01 and BB2449-003 infringe her image 968191-001 (DX 38) (S. R. Mem. App. 1); (2) McClymont's image BC1539-003 infringes her image 968194-001 (S. R. Mem. App. 2); (3) Brown's image BA3281-005 (DX 80) infringes her image 968199-001 (DX 81) and the cropped Caremark tearsheet (S. R. Mem. App. 3); and (4) McClymont's image BC7914-004, and D. Oliver's images BC7958-001 (DX 86) and BC9641-001 (DX 88) infringe her image EB0958-001r(DX51)(S. R. Mem. App. 20).

16

where the gap between the idea of a work and its expression merge so the two become nearly inseparable, copyright protection must likewise narrow to avoid granting an effective monopoly of the idea itself (Atari, 672 F.2d at 616, discussing idea-expression unity and quoting at length from Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738, 742 (9th Cir. 1971), which held a jeweled bee pin was not copyrightable).

Wildlife Express, 18 F.3d at 508 (internal quotation marks and citations omitted, emphasis in original) has explained that sliding scale of protection:

> When reproduction of a lifelike object is at issue, a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not required by the idea. One court has found that the design of a jewelled [sic] bee pin provided nothing new to the idea of the pin; therefore, since copying the pin necessarily would entail copying the idea as well as the expression, copying the expression was not barred. However, as a work embodies more in the way of particularized expression, it moves away from the bee pin..., and receives broader copyright protection. At the other end of the spectrum, creative complex artistic expressions are more fully protected.

Under that doctrine of merger, where the "works at issue deal with the reproduction of a lifelike object," substantial similarity must be shown as "to those few aspects of the work that are expression not required by the idea" (Susan Wakeen, 272 F.3d at 451, quoting Wildlife Express, 18 F.3d at 508 (emphasis in original)). And where nothing has been added to the expression of the work over the idea such that idea and

17

expression become indistinguishable, there will be no protection against anything other than identical copying (Atari, 672 F.2d at 616).

At issue here is the idea of a photographic portrait of a naked baby, and just such a merger of expression and idea is evident in Gentieu's simple close-up shots of babies on a white background. All aspects of her particular expression follow necessarily from the idea of taking a baby photograph. Gentieu v. John Muller & Co., 712 F. Supp. 740, 744 (W.D. Mo. 1989) discussed the scope of protection for Gentieu's "floating baby" images[7] in an earlier and unrelated copyright lawsuit:

> In the case at bar, the plaintiff, in using her copyrighted expression (lighting, choice background, camera angle, etc.) has not expanded on the idea of a photograph of a naked baby any more than the sculptor who adds nothing to the idea of a plaster nude statute. This is not meant to minimize the plaintiff's work in any way; its simplicity is its creativity. However, by utilizing her expression in such a way as to create a naked baby and nothing else the plaintiff limits her copyright protection to the identical copying of the copyrightable elements of her work.

This Court concurs with that well-reasoned approach: Gentieu's copyright over the four protected head-shot images is exceedingly thin in scope. By expressing her artistry through

---

[7] Although Muller, 712 F. Supp. at 741 concerned different circumstances and a different Gentieu image, Muller described that image as a photograph of an "isolated" naked baby "devoid of any background or props"--a good verbal description of those now at issue. Hence the Muller determination of the narrow scope of Gentieu's copyright for a photograph of a "floating naked baby" is strongly instructive.

images that can best be described as photographs of naked babies devoid of any other detail, she has added nothing protectible by copyright to the idea of a baby photograph. Because idea and expression have so merged, the scope of Gentieu's copyright protection in these images extends only to exact copying. To find otherwise would come all too close to granting one photographer a monopoly over all photographs of naked babies on white backgrounds--an outcome at war with the basic principles and objectives of the Copyright Act.

But as Gentieu correctly points out (and as <u>Muller</u>, <u>id</u>. explained), that alone does not entitle Getty to summary judgment as a matter of law. Copyright infringement could still be established if Getty had created exact copies of Gentieu's images by photographing the images themselves or, as Gentieu suggests was done here, by photographing a live subject but selecting all the relevant components--subject matter, camera angle, lighting and so on--so as to duplicate all of the compositional elements contained in the protected photographs (<u>Muller</u>, <u>id</u>., citing 1 <u>Nimmer on Copyrights</u> ("<u>Nimmer</u>") §2.08[E][1] at 2-122 (1988)).

Gentieu urges that because the allegedly infringing images show babies of similar ages and coloring and use white backgrounds, straight camera angles and a sharp focus, they are sufficiently similar to hers to infer such an attempt at exact copying. But the allegedly infringing photographs cannot be

19

considered identical copies of Gentieu's images. As already explained, Gentieu has not preempted the universe of baby photography--the use of babies as models per se is not protected by Gentieu's copyrights, and the babies and images chosen for the allegedly infringing photographs differ from Gentieu's babies and images in obvious ways.[8]

Gentieu's other claims of similarity as to the focus, angle and background of the photographs fail under the doctrine of scènes à faire (i.e., scenes that "must" be done)(see 4 Nimmer, §13.03[B][4] at 13-73 to 13-75 (2002)). Often applied to dramaturgical literary works, the scènes à faire doctrine holds that elements of a work that "are as a practical matter indispensable, or at least standard, in the treatment of a given topic" cannot be the basis of a "substantial similarity" holding (Atari, 672 F.2d at 616). Under that doctrine Gentieu's copyright protection extends only to those compositional elements of her work that are original to her expression, rather than to standard photographic conventions or devices.

True enough, both the protected and the accused photographs

---

[8]    To mention only a few obvious items, S. R. Mem. App. 1 depicts babies with different facial expressions and grooming from Gentieu's; the protected and accused images on S. R. Mem. App. 2 are of different races and ages; the accused baby photograph on S. R. Mem. App. 3 is on a black background, has an opened mouth expression and is cropped midway between Gentieu's original image and her Caremark Tearsheet; and the babies in the allegedly infringing images on S. R. Mem. App. 20 are framed off-center and are of different coloring than the baby in Gentieu's image.

are in focus rather than blurry. And all of the images show the baby facing the camera on a plain background rather than turned away or in a natural setting. But such basic elements of studio portrait photography cannot properly be considered as original within the meaning of copyright law, and under the scènes à faire doctrine they cannot be the basis of substantial similarity.

In a further application of the same principle, Gentieu's contentions about the copying of her "high white" backgrounds must be assessed as to the originality of that element. Gentieu's sophisticated lighting technique is an element central to the particularized look of her images. She described in great detail how she creates this "high white" look by placing the baby on plexiglass that is lit from beneath with diffused white light. According to G. Mem. 23:

> The negative space created by the bright white light absent color, value, shading, tonality and texture, without suggestions of space or relationship to environment is a defining element of Penny Gentieu's signature style. It is not a white background in the ordinary sense, such as that of a white wall or white paper.

At least arguably, then, the "high white" backgrounds in Gentieu's images might perhaps be considered an original element protected by her copyright (although, as indicated later, at least some other photographers have independently employed essentially the same technique).

But that cannot and does not mean that her copyright extends

to the use of any white background as such. Conventional

passport photography alone demonstrates that the selection of a

white background for a photographic portrait cannot be considered

original to Gentieu's work. Even more to the point, white

backgrounds created by walls, boards, curtains or the like are

commonly used in studio photography and are also particularly

suited to stock images frequently used as cut-outs (S. St. ¶¶119,

122, 144, 152). Even viewed in the light most favorable to

Gentieu, then, the copyrightable elements of her works do not

include all white backgrounds, but only those "high white"

backgrounds created by diffused lighting.

Here the uncontroverted evidence shows that Getty's

photographers did not in fact replicate Gentieu's technique for

taking her baby pictures. Each photographer's images were shot

by placing a baby in front of an actual white studio background

such as a white board, cove or curtain (S. R. St. ¶¶447, 473,

512, S. Ex. 119 at 33)--standard elements of studio photography

outside of the scope of Gentieu's copyright. It is thus

undisputed that Getty's photographers did not attempt to

replicate Gentieu's lighting, instead employing commonly used

backgrounds to express the uncopyrightable idea of a photograph

of a naked baby.

On the premise that "one picture is worth more than 10,000

words" (though if that concept were really applied here, this

opinion might have to rival the Encyclopedia Britannica in
length), Ex. 1 to this opinion is illustrative of the absurd
lengths to which Gentieu and her counsel have gone in arguing for
substantial similarity between her images (in this instance on
the left) and those of claimed infringers (in this instance V.
Oliver's photo on the right). G. Mem. 21-23 occupies fully two
pages in pointing to eight nits as claimed indicia of similarity
(it is surprising only that the facts that both subjects are
babies and that both pictures were taken with a camera are not on
the list). Over and above London photographer V. Oliver's sworn
testimony (which is not only uncontroverted but also faces no
predicate for an inference casting a cloud on its credibility)
that the photograph was of his daughter in 1995 (before a
September 1996 art director's directive that Gentieu relies on as
"evidence" of copying--a directive that is not shown to have gone
to V. Oliver at all), the objective viewer's eye reveals the
frivolousness of Gentieu's claim. And it is noteworthy that
Gentieu has selected what she considers only the 15 best
examples--including this one--of purported copyright infringement
to argue on the current motion (see n.4).

In sum, Gentieu's copyrights for her four close-up baby
images protects only against identical copying--no reasonable
juror could conclude that such exact duplication took place.
Because any similarity between the accused photographs and

Gentieu's four works involves only the noncopyrightable elements of Gentieu's images, as a matter of law they are not substantially similar. And so Getty's motion for summary judgment on that aspect of Gentieu's copyright claim is granted.

(b) <u>Digital Compilations</u>

In all Gentieu alleges that ten of her photocompositions of baby photographs are infringed by digital composites of babies created by Getty or Getty's other photographers. While Gentieu's images are clearly more complex than the close-up shots described above, so that they warrant more extensive copyright protection, once again no reasonable juror could conclude that the protectible elements of her works are substantially similar to the accused images. For convenience in the ensuing discussion as to such substantial similarity, those images will be grouped into categories.

(1) <u>Progress Shots</u>

Gentieu claims that six of her copyrighted images are infringed by three photocompositions in the Getty collection.[9] Those stem from photographs taken by V. Oliver, Olney and D. Oliver in response to suggestions by their art directors or others to create progress shots: images showing the same baby's growth and stages of development over time (S. St. ¶¶110, 142,

---

[9] Those allegedly infringing images are V. Oliver's BB5925-014 (DX 3), Olney's BC6052-036 (DX 7) and D. Oliver's BC 9491-001 (DX 89).

24

122). Those photographs were then digitally compiled, either by Getty or others, into the three images that were accepted into the Getty collection (id. ¶¶111, 142, 122). Of the six copyrighted Gentieu images, three are digital photocompositions of progress shots,[10] two are shots of babies from above lying on quilt or blanket-like squares[11] and the last one is a photocomposition of multiple babies superimposed upon the number "2000."[12]

Once more Gentieu's arguments of substantial similarity are fundamentally flawed. Comparison of the allegedly infringing images to Gentieu's three progress shots reveals that any similarity between the two stems only from the common but unprotectible idea of photographing growing babies. As for Gentieu's other images, the differences in the expression of those works so overwhelm their generic similarities that no genuine issue of fact exists as to unlawful copying.

First to the three allegedly infringing images. V. Oliver's is a compilation of photographs of a baby growing over four months in positions that show its development from a supine infant to a four-month-old on her hands and knees. Each baby is

---

[10] Gentieu's images 994918-001 (DX-75) (S. R. Mem. App. 17-18), EA6148-001 (S. R. Mem. App. 10-11) and EC1948-001 (S. Rep. Mem. App. 33).

[11] EA6138-001 (DX4) (S. R. Mem App. 14) and EA6138-002 (DX5) (S. Rep. Mem. App. 15).

[12] EB0963-001 (S. R. Mem. 21).

diapered in white and pink and lies across a blocky white arrow
that becomes more pronounced against the black background as the
baby grows. Olney's is a digital compilation of six photographs
of a single baby over a six-month period. Each of those images
is superimposed on a green block number (running from one through
six and set out in two rows) against a blue background. D.
Oliver's is a digital compilation of six photographs of a
diapered baby shot over a six-month period.[13] Set on a solid
deep blue background, the six photographs overlap each other in a
spiral that begins in the lower left with the youngest and
smallest baby and ends with the oldest and largest baby in a
seated position foremost in the image.

Although three of Gentieu's images are also progress shots
depicting growing babies, there are no similarities between her
expression of that idea and the three accused progress shots.
Gentieu's image 994918-001 (DX75) is a compilation of six
photographs of the same baby growing in age and size and shown in
advancing stages of development: lying flat, lifting its head,
sitting up, crawling, standing and with an open mouth indicating
an ability to talk. Those six shots have been placed alongside a
tape measure in a zigzag pattern against a background of a blue
sky with clouds. Image EA614-001 (DX 6)(S. R. Mem. App. 17) is a

_____

[13] Unlike V. Oliver and Olney, D. Oliver testified that the
idea for that image and the compilation work were those of a
photograph retoucher rather than Getty (S. St. ¶122).

26

photocomposite of six photographs of a baby (three naked and three diapered) at different stages of growth and development. Each shows the baby "riding" on top of a monthly calendar page simulating a "magic carpet," and those images are set against a background of a blue sky with clouds. Arranged in a single circle, the images of the baby on calendar pages gets larger as the baby grows in size. Last, Gentieu's image EC1948-001 digitally compiles five photographs of babies that grow in size and are shown playing with blocks at increasing stages of development and complexity. Four of the five babies are shown against pastel colored blanket-like images, from which the outline of a baby has been cut out to expose the otherwise white background.

Once again a visual comparison of these protected and accused images reveals that as a matter of law they are not substantially similar. Any similarities stem only from the fact that all of the images depict babies growing and developing over the first few months of their lives. In addition to the non-copyrightability of the mere use of a baby in a photograph, the concept of growth or development that underlies all of the photos is undeniably only an idea--so it too cannot be the basis for substantial similarity.

That idea is expressed completely differently in the different images. Growth in Gentieu's images is shown by a

27

measuring tape, calendar pages or facility with blocks, while the accused photos use arrows, numbers and outward spiral. Gentieu's photography expert Rodney Slemmons ("Slemmons")[14] testified that these images were substantially similar in expression because those items are all abstract ways of measuring (S. Ex. 60 at 125-31). But that reflects the fundamental vice in Gentieu's entire case: It attempts impermissibly to claim a monopoly over abstract ideas, while it is of course the expressions of that abstract idea that matter. Here those expressions are patently different. Moreover, all of the compositional elements in the images (lighting, background, position of the images and what have you) are obviously dissimilar.[15]

---

[14] G. Mem. 21 asserts that such expert testimony is unnecessary here, where most of the baby photographs are not so technical or intricate in nature as to require specialized knowledge (Ty, Inc. v. GMA Accessories, Inc., 959 F. Supp 936, 942 (N.D. Ill. 1997)). And there is highly respectable authority (see, e.g., Computer Assocs. Int'l, Inc. v. v. Altai, Inc., 982 F.2d 693, 713-14 (2d Cir. 1992), quoted with approval in Sturdza v. United Arab Emirates, 281 F.3d 1287, 1301 (D.C. Cir. 2002)), that reconfirms "the traditional role of lay observers in judging substantial similarity in copyright cases that involve the aesthetic arts, such as music, visual works or literature." As sensible as that seems, it is also true that expert testimony on substantial similarity is not impermissible as such (it was used, for example, in Susan Wakeen, 272 F.3d at 441-42). Here, because both parties cite to Slemmons' testimony in presenting their own arguments on substantial similarities, this opinion does so as well--but Slemmons' opinions cannot create material factual issues where they conflict with the controlling "total concept and feel" standard.

[15] Gentieu's babies are set against the sky or emerge from pastel blankets and appear to interact with their environments rather than with each other. In contrast, the babies in the accused images are set starkly against a background of solid

Gentieu also contends that the images by V. Oliver (growing baby on white arrow) and Olney (growing baby superimposed on numbers) infringe two of her images that show babies from above on pastel blankets or quilt-like squares. First, Gentieu's image EA6138-001 (DX4) depicts nine babies shot from above. Each colorfully diapered baby is playing with its legs while resting on a separate pastel colored square of a quilt. Second, Gentieu's image EA138-002 (DX5) is a compilation of 25 photographs of ethnically diverse babies wearing colorful diapers and resting on rectangular pastel blankets. Shot from above, those images are assembled in a rectangle so as to resemble a large 25-square quilt.

Gentieu's assertion that her images are substantially similar to the V. Oliver and Olney progress shots is no better than frivolous. Besides the unprotected idea of photographing babies, the only real similarity is that the pictures are shot from above and are compiled in rows (see S. Ex. 60 at 149-50).

Indeed, differences between the images abound. Slemmons' testimony actually confirms that the images do not express the same idea in a substantially similar way (S. Ex. 60 at 148-49). V. Oliver and Olney's images show the same baby growing over time, while Gentieu's images do not depict growth at all. Her

---

color or white graphics. D. Oliver's photograph uses overlapping images, while many of the babies in V. Oliver and Olney images appear to be reaching out for each other.

nine-square image combines nine photographs of what appears to be the same baby shot at the same time (the same age and size), and her larger image shows 25 babies of various ethnicity but of roughly the same age. Differences also characterize the color schemes of the images: Gentieu's babies wear brightly colored and patterned diapers and are on pastel surfaces, while V. Oliver's white-diapered baby is on a stark black and white background and Olney's babies are on green numbers set against a bright blue background.

Also baseless is Gentieu's allegation that Olney's image (growing baby on numbers) infringes on her image EB0963-001. That Gentieu image is a digital photocompilation of 20 naked babies shot from above, superimposed on the number "2000" in blue blocky print. For each of the four numerals, five of the 20 babies are grouped and positioned along its contours.

To be sure, both images show babies from above superimposed on numbers, but any "similarities" in expression end right there. As already described, Olney illustrates growth by shooting the same baby over six months and overlaying the photos on increasing sequential numbers from one to six. In contrast, Gentieu's image portrays ethnically and otherwise diverse babies of approximately the same age and size superimposed on what is likely meant to indicate the year 2000. And while Olney's babies are lined up vertically in two rows, obscuring parts of each number, Gentieu

has positioned her babies to follow the contours of each number, as though the babies' bodies are themselves forming the digits. As with Gentieu's progress shot images and quilt images, then, no material issue of fact is raised by the minimal similarities, which are dwarfed by the differences between the "2000" image and Olney's progress shot.

To summarize, none of the accused images bears a substantial similarity to Gentieu's works. Getty's motion for summary judgment as to those images is granted as well.

### (2) Hall's Cloning Images

Gentieu also says that three photocompositions of photographs by Hall infringe two of her images.[16] Hall's three images were shot in response to his Getty art director's suggestion to take a "slightly disturbing shot of children" to represent the idea of human cloning (S. R. St. ¶528).

First, Hall's image BD1603-025 (DX 16) depicts five identical babies set in a row, with bar codes on their heads, against a high white background devoid of shadows. Each baby wears a white diaper, has its mouth open and its arms raised and spread so that each appears to touch or nearly touch the baby beside it. Second, Hall's image BD 1603-026 (DX 17) is a photocomposition of multiple photographs of the same diapered

---

[16] Gentieu claims that Hall's pictures--BD1603-025 (DX 16), BD1603-024 (DX 15) and BD 1603-026 (DX 17)--infringe her images EA6127-001 and EC1925-001.

baby in various positions and orientations set against a high white background. Cropped as a vertical rectangle, the image shows five photographs in full, with the rest cut off so that only part of each baby's body is in the frame. None of the babies overlaps or touches any other. Third is an image of multiple plastic baby dolls, identical except that roughly half are black and half are white, arranged in various orientations against a high white background. Again, the image is cropped, here in a horizontal rectangle, such that only parts of the dolls are shown around the edge of the frame. Several of the dolls overlap or seemingly touch other dolls.

All three of those images are accused of infringing on Gentieu's "baby ball" image, which compiles multiple photographs of ethnically diverse babies arranged in a circle against a high white background. But though, as noted by Slemmons (S. Ex. 60 at 118-19), each of the images contains a crowd of babies (or baby dolls) and a high white background, it cannot be said that the images are substantially similar. Slemmons went on to acknowledge that the images did not convey the same idea to the viewer (S. Ex. 60 at 121-24). All of Hall's images depict the same baby (or baby doll) replicated over and over, suggesting the idea of cloning, while the babies in Gentieu's image differ significantly in appearance by race, coloring, diapering and hair growth, all suggesting natural diversity.

Additional differences in the images are obvious. Hall's bar coded babies are positioned vertically and overlap each other in a single row, while Gentieu's babies are in a variety of positions, some sitting, some nearly upside down, some with their backs or sides to the camera. Although the babies (or baby dolls) in Hall's other two images have been rotated vertically, all are shown with their legs almost fully extended and with their fronts toward the camera. Further, Gentieu's circular composition is a self-contained image, while Hall's images, by showing partial babies cut off along the edges of the frame, give the impression that the babies repeat continuously beyond the frame of the image.

In another frivolous attempt to argue substantial similarity, Gentieu alleges that Hall's bar coded baby image infringes on her image of six babies in a row on a blanket.[17] That both images comprise pictures of the same or a similar baby arranged in a single row is far outweighed by the obvious differences in the images. While Hall's babies appear to be floating in high white space, Gentieu's babies lie on alternating blue and green blanket-like squares and wear brightly colored blue and green diapers alternating in color to contrast with the blanket colors. Nothing in Gentieu's image even begins to suggest the unnatural or commercial replication of babies that is

---

[17]    EC1925-001 (DX6) at S. R. Mem. App. 25.

implied by Hall's bar-coded babies.

As Gentieu would have it, the crowding together of babies on a high white background for all of the images makes Hall's images substantially similar to her own. But that slight similarity pales in relation to both the different ideas expressed in the images and the many differences in how those ideas are expressed.

Moreover, any similarity between the high white backgrounds in Hall's images and Gentieu's does not imply infringement, because the uncontradicted evidence is that Hall's images were independently created. Although Hall (unlike other photographers) did use a diffused lighting technique to create the high white background for his images, he had been aware of the technique and had used it frequently in his own work before taking the photographs (S. R. St. ¶527).

### (3) Baby Spiral Images

Gentieu created a digital photocomposition of overlapping photographs of the same baby in a helix spiral that was submitted to but never accepted by Getty. She charges that two images, one by McClymont and the other by D. Oliver, infringe her copyright on that image.[18] D. Oliver's is the same one discussed earlier: progress shots of a growing baby taken over a period of months and arranged in a spiral on a blue background. McClymont's is a

---

[18]    Here the images at issue are McClymont's BC7869-001 (DX 27) and D. Oliver's BC9491-001 (DX 89) as against Gentieu's image labeled "pg6010" (DX 28) (S. R. Mem. App. 38).

digital composite of five photographs of the same baby expressing grief, set out in a spiral on what appears to be a light blue background.

Although those images and Getty's submission depict babies in a spiral pattern on a solid background, the far more significant differences in both the idea and the expression of the images render that element of similarity insubstantial. While Slemmons characterized those formal elements of the images as similar, he went on to testify that the images expressed different ideas to the viewer (S. Ex. 60 at 136-42). By repeatedly overlapping the same image in a helix type spiral that seems to extend into infinity, Gentieu's image conveys an idea of unnatural DNA replication, cloning or assembly line reproduction. In contrast, McClymont's grieving babies communicate severe distress or pain to the viewer. As discussed earlier, D. Oliver's image expresses the basic concept of a baby's growth over time.

Compositional elements of the images also differ. In contrast to Gentieu's high white image, D. Oliver's babies are set against a deep blue background, and the lighting in McClymont's image reflects off each baby's face and skull such that their heads seem to fade into the light bluish background. All of the babies in D. Oliver's image are fully within the frame of the image, as opposed to Gentieu's image in which only the

head and shoulders of the foremost baby are visible.   Although
McClymont's image also depicts the front baby's head and
shoulders cut off by the bottom of the frame, none of the babies'
bodies are depicted, whereas Gentieu's photographs show the
baby's body.   Because the images convey markedly dissimilar ideas
to the viewer and differ in composition, they cannot reasonably
be considered substantially similar.

### (4) Honowitz Image

For similar reasons, Gentieu's claim that Honowitz' image
871072-001 (DX 157) infringes on her image EA6129-001 (DX 156) (S.
R. Mem. App. 13) cannot withstand summary judgement.   There is
once again an element of similarity:   Both are digital
photocomposi-tions that include an image of a baby being held up
in the air and looking directly at the camera, superimposed on an
image of a house at the top of the frame.

But major differences in the concepts behind the images and
the expressions of those concepts are clear.   Gentieu's image
shows two adults (presumably the parents) holding up the baby,
thus conveying the idea of creating a new family.[19]   In Honowitz'
image the baby is held by disembodied arms and surrounded by
images of a graduation cap, a wedding cake and two elderly hands

---

[19]   As Getty correctly points out at S. R. Mem. 37-38,
Gentieu's attempted introduction of new evidence about editing a
dollar bill out of the image is both inappropriate--given that it
was not produced in discovery--and unhelpful, as the dollar does
not transform the idea of the image into the "cycle of life."

clasped together in addition to the house--all suggesting the cycle of life from birth to maturity.[20] In addition to those different conceptual ideas, the formal elements of the images also differ. Honowitz' image is sepia-toned throughout, with the different images arranged in a rough circle, while Gentieu's image depicts the parents and child in real tones stretching out around the house, which is colored a mottled blue and green that blends into the background.

(c)  Frightened Child Images

Lastly, Gentieu asserts that images by Tucker (EA4972-001) and Condit (AR6829-001 (DX 159)) infringe on her image 981167-001 (DX 158) (S. R. Mem. App. 6). As Slemmons testified, all of those images do convey the idea of a frightened child in jeopardy, expressed by showing that child backed into a corner (S. Ex. 60 at 158, 164).

But in this instance the differences in expression belie Slemmons' conclusion of substantial similarity as unreasonable and unpersuasive. In Tucker's image the male child is alone, bent down in the corner with his arms crossed, and seems isolated or neglected or alternatively to be crouching away from the light itself. In contrast, the child in Gentieu's photograph is recoiling and holding her hands up to protect herself from an

---

[20]  Slemmons testified that both images conveyed the idea of parental responsibility, but his assessment assumed without explanation that the additional images in Honowitz' image were of less importance than the baby (S. Ex. 60 at 154-56).

adult shadow with its hand raised seemingly about to strike the child. Although there are shadows also in Condit's image, those shadows seem to be of two adults arguing with each other, rather than of a direct act against the child, who stands frightened in her nightgown holding her teddy bear.

There are also critical differences as to their compositional elements. Gentieu's is in real color suggesting daytime, while the others are in monochromatic blue and purple indicating nighttime. Next, Gentieu's child is older than those in the accused images. Further, Gentieu's image is more closely cropped on the child, and the camera is angled down from the point of view of the aggressor himself, while the Tucker image has a longer perspective and the Condit shot is taken from lower down and angled to the side, rather than directly facing the child.

\*             \*             \*

In many ways it has been an imposition to have been compelled to parse all of the photographs presented in the record, only to reveal the basic truth that Gentieu's self-image rather than her photographic images is what has driven this aspect of the litigation. She obviously sees herself as the sole fount of both ideas and expression when it comes to photographing babies, and woe betide anyone who is seen as poaching on that territory. And she is not aided by calling an "expert" to her

aid--one whose opinions in her favor do not withstand analysis.

Given the impermissibly expansive nature of Gentieu's
claims, it is only surprising that she has not asserted a
copyright in the universe of babies as well.[21]  Indeed, Gentieu's
monopolistic efforts are exacerbated by the fact that she has
made a like attempt against another purported "infringer" some 15
years ago, only to be shot down for similar reasons via another
summary judgment (Gentieu v. Muller, 712 F.Supp. 740 (W.D. Mo.
1989)).

To sum up what has gone before, none of the assertedly
infringing images is substantially similar to copyrightable
elements of Gentieu's works.  For all of the images, the scope of
Gentieu's copyrights does not extend to protect either (1) the
idea of a portrait photograph of a naked baby or (2) unoriginal
elements of its expression, such as a white background or sharp

_____

[21]  Gentieu's extraordinarily overbroad view of the scope of
her claim on grounds of "substantial similarity" has a
particularly ironic twist in light of the 1993 Contract ¶2.1
provision that prohibited her (with a limited exception) from
independently licensing images that were "Essentially Similar" to
images she had provided to Getty for licensing.  Gentieu seeks to
read "Essentially Similar" very narrowly to give herself the
maximum opportunity for independent profits via her own website:
She urges that "Essentially Similar" has a meaning that is wholly
dissimilar to the "substantially similar" concept at issue
here--and she urges that even though the 1993 Contract
specifically defines the former term in terms of whether images
are "substantially the same."  This Court need not digress to
parse the two standards in terms of their scope.  What is clear
is that to Gentieu it is really a matter of whose ax is being
gored--she is unwilling to acknowledge any extent to which her
restricted reading of "Essentially Similar" may be out of sync
with her all-encompassing reading of "substantially similar."

focus.

Because Gentieu's close-up photos of babies do not add any
original elements of expression beyond that idea, in those images
Gentieu's expression has merged with the idea itself and her
copyright protects only against identical duplication of her
photographs. None of the allegedly infringing close-ups can be
considered exact copies of her images, due to numerous visible
differences and the uncontradicted testimony that the photographs
used a tangible white studio background rather than diffused
lighting to create Gentieu's high white effect.

Although Gentieu's other works are significantly more
detailed than those close-ups, once again <u>substantial</u> similarity
between those works and the accused Getty images is absent.
Although in some cases (such as the progress shots and the
frightened child images) the works share a common idea, the
images express that idea in markedly different ways (e.g., a tape
measure vs. an arrow) and use distinguishing compositional
elements (background, positioning of images, etc.) precluding a
finding of substantial similarity. In other cases such as the
"baby ball," the spiral images and the Honowitz image, not only
do the expressions of the images differ significantly as to
background, cropping and other factors, but also the protected
and accused works convey completely different ideas (e.g.,
cloning vs. growth) that render insubstantial any formal

similarities in the images.

## 3. Independent Creation

But there is more. Even if a different view were taken as to any of the more complicated images--even if they had raised (as they have not) a colorable case for substantial similarity, that type of showing combined with proof of access simply operates to raise a presumption of copying that can be rebutted by evidence of independent creation. For the sake of completeness, this opinion turns to Getty's compelling showing on that score.

As already quoted from Susan Wakeen, 272 F.3d at 450, "the inference of copying that is drawn from proof of access and substantial similarity can be rebutted by the defendant's showing that it independently created the allegedly infringing work." Because the copyright laws prohibit only copying, even identical works do not infringe if they were created independently of the protected work (Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1169 (7th Cir. 1997)). Further, once the copyright defendant offers evidence of independent creation to rebut that inference, plaintiff has the burden of proving[22] that defendant in fact copied original work (Peel & Co. v. Rug Market, 238 F.3d 391, 395 (5th Cir. 2001)).

---

[22] In the summary judgment context, plaintiff has the lesser burden of establishing the existence of a genuine and material factual issue on that score.

Some courts have gone slowly in granting summary judgment on the basis of evidence of independent creation, on the ground that some such evidence may perhaps not be credited (<u>Langman Fabrics v. Graff Californiawear, Inc.</u>, 160 F.3d 106, 115 (2d Cir. 1999); <u>Wrench LLC v. Taco Bell Corp.</u>, 256 F.3d 446, 460 (6th Cir. 2001)). But summary judgment has been granted when defendant has put forth clear evidence of independent creation and plaintiff has not come forward with any evidence of copying (<u>Calhoun v. Lillenas Publ'g</u>, 298 F.3d 1228, 1233 (11th Cir. 2002)). That unexceptionable result is simply an application of the general proposition that the absence of a material issue of fact--this time with respect to independent creation--justifies a grant of summary judgment (<u>id</u>.).

Here any inference of copying that could even arguably be raised by Gentieu has been rebutted by uncontradicted evidence that the images were independently created, rather than copied from Gentieu. All of the London photographers testified (1) that they had not viewed the Gentieu images that they are alleged to have infringed and (2) that they were not instructed by Getty to copy or rely on Gentieu works in creating their own images (S. St. ¶¶136, 123; S. R. St. ¶¶445, 114, 449, 528, 481, 466, 515). All of Gentieu's efforts to counter those denials come up empty.

Gentieu attempts to make much of the fact that most of the photographers had not taken pictures of babies before. But all

of the photographers, including Gentieu herself, routinely created images in response to shoot briefs from Getty. That Getty gave others the _idea_ to photograph babies does not suffice to create a reasonable inference of copying.

Gentieu's argument that Getty's art directors (G. St. ¶¶445, 474, 477, 497, 515, 528) directed unlawful copying of her images is totally unfounded. None of the shoot briefs to other photographers identifies Gentieu's images or directs the copying of her images.[23] Rather they summarized market research, offered image _ideas_ (such as cloning or progress shots) that were likely to be in demand, and made suggestions for composing images that would sell well.[24]

Contrary to Gentieu's mischaracterization, art directors did not require that the photographers use specific compositions or techniques and were not present at the studio when the photographs were shot. For example, Gentieu misstates that Hall

---

[23] Although one shoot brief does identify a Gentieu image as a frequent seller and requested more like it, there is no evidence that it was sent to anyone other than Gentieu herself (G. Ex. 4; S. R. St. ¶37). Moreover, the identification of an image as successful is hardly the same as directing a photographer to copy the image unlawfully.

[24] For example, an art director suggested that V. Oliver and Olney take their progress shots (S. R. St. ¶¶445, 499). Similarly, D. Oliver recalled that his art director may have suggested that he shoot "stuff of children looking to camera close in" and to use a clean background "because it was easier to cut out from" (S. R. St. ¶515). Also similarly, McClymont's shoot brief on babies stated: "for maximum effect and usage, you can shoot babies on fairly plain backgrounds but this is up to you" (S. R. St. ¶481).

"was instructed to photograph the young baby directly from above on a backlit perspex" (G. St. ¶527). But Hall's actual deposition testimony was that although the idea for the cloning shoot came from his art director, he came up with the diffused lighting technique of his own accord and had used such lighting conditions frequently in his work (S. R. St. ¶527). That practice of communicating shoot ideas is common in the industry to provide photographers with ideas for needed photos (see, e.g., Kaplan, 133 F. Supp.2d at 319-20) and is not in and of itself suspect, let alone evidence of copying.

Moreover, Gentieu herself received and responded favorably to such shoot briefs from her own art director that made similarly detailed suggestions for her images. For example, her art director gave her the general idea to create a "photo that expressed cloning" (G. St. ¶426) and made the specific suggestion to "use monthly calendar pages as magic carpets" in a progress shot (G. St. ¶448), and also provided her with art direction and a tear sheet for the creation of her baby quilt shots (S. St. ¶67). Gentieu was also directed to shoot close-ups of babies and head shots and to use a "white seamless, or other method to light the scenes in a way that creates a glow around the babies" (S. Ex. 25). It is totally unreasonable for her to complain that the similar "direction" provided by Getty to other photographers is evidence of copying.

Indeed, all of the evidence properly in the record[25] confirms that Getty's communications about baby images to its photographers were abstract ideas about taking photographs that would sell well, not directions or even inferential suggestions to copy the particular expression in any of Gentieu's images. Again such ideas are not protected within the scope of Gentieu's copyrights.

Thus Gentieu has produced no evidence that would raise a material issue of fact to counter the independent creation of the accused Getty images. Even if her insufficient showing of substantial similarity had been credited, there is no evidence to suggest a reasonable inference of copying. For that independent reason as well, Getty's motion for summary judgment on those copyright infringement claims must be and is granted.

## Alleged Misconduct Regarding Gentieu's Images

Gentieu separately argues that Getty engaged in numerous practices as to the licensing of her images that exceeded the scope of the 1993 Contract and thus violated her exclusive copyrights under 17 U.S.C. §106[26] (Gentieu's related breach of contract claims are addressed in a later section of this

---

[25] Gentieu's remaining evidence consists largely of inadmissible hearsay evidence, unsupported speculation or citations to evidence that is not properly in the record (see e.g., G. St. ¶¶433, 444, 447, 454, 463).
[26] Further citations to the copyright statutes take the form "Section," omitting repeated references to Title 17.

opinion).   Gentieu seeks to hold Getty liable for asserted misconduct by Getty's customers who licensed her images, as well as for Getty's own practices in licensing her images.

1.   Getty's Liability for Third Party Misconduct

Gentieu tries to make Getty financially responsible, under copyright infringement and breach of contract theories, for two types of misconduct by Getty's customers:   (1) using her images without a license and (2) materially altering her images to create derivative works.[27]   Getty responds that its liability for any of its customers' conduct that amounted to infringement of Gentieu's images is expressly limited by the terms of the 1993 Contract.   Here are the relevant parts of 1993 Contract ¶¶6.2 and 6.3:

> 6.2   In the event of loss, damage, or misuse to any of the Images, the Contributor [Gentieu] grants TSI [Getty] full and complete authority to make claims and institute licenses on the Contributor's behalf,   All settlements and litigation decisions of any nature shall be at TSI's sole and complete discretion....

> 6.3   The Contributor understands that the Images may, over the years, be lost or damaged or fade through normal usage.   However, in no event shall TSI be liable to Contributor or to any other person or entity for any loss, damage, or misuse of the Images....If, however, compensation for loss, damage, or misuse of Images can be obtained by TSI from third parties, TSI will make a reasonable attempt to do so as set forth in paragraph

---

[27]   Section 101 defines a derivative work as "a work based upon one or more preexisting works...consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." Such works are subject to separate copyright protection under Section 103.

> 6.2 and TSI's related share of compensation is provided
> to give TSI some incentive to pursue appropriate claims
> against third parties in regard to the loss, damage, or
> misuse of any Images....

Getty contends that those provisions gave _it_ the right to pursue

copyright infringement of Gentieu's images by third parties,

while at the same time limiting Getty's own liability as to such

infringement.

Gentieu now argues that those provisions refer only to

Getty's liability for misuse of the physical property of her

images. But that attempted reading is directly contrary to the

one originally embraced by Gentieu's Complaint. Citing those

very paragraphs of the 1993 Contract, Gentieu's Complaint ¶¶15-16

alleged:

> 15. By its own terms, the Gentieu-TSI License required
> TSI, its successors and assigns including upon
> information and belief GII, to "make a reasonable
> attempt to" "make claims and institute lawsuits in
> TSI's name on [Photographer's] behalf" "in the event of
> loss, damage or misuse to any of the [Photographer's]
> Images."

> 16. Despite such an obligation, TSI made Licensing and
> Sales of Photographer's Images to third parties, but
> did not pursue those third-parties for copyright
> infringement when those third parties cropped or
> otherwise altered Photographer's images or when those
> third parties used others of Photographer's images
> without permission and without paying for Licensing
> Sales.

In short, Gentieu expressly alleged that Getty had an obligation

under those provisions of the 1993 Contract to pursue third

parties for their "misuse" of her images that amounted to

copyright infringement. Getty's Answer denied the Complaint's allegations, but did not do so at all as to that statement of its contractual duties--its denial was rather on the ground that it had taken reasonable steps to seek such recovery.

Gentieu, then represented by an intellectual property law firm with particularized expertise in copyright law, crafted her Complaint carefully to accuse Getty of failing to fulfil what she characterized as its <u>obligation</u> under 1993 Contract ¶¶6.2 and 6.3 to enforce Gentieu's copyrights. Having thus characterized the contractual term "misuse" in those provisions as including copyright infringement from the outset, Gentieu cannot now retreat from what she has come to view as an unfavorable position.[28] This Court adopts the parties' mutual construction of the clause in their pleadings, and it hence concludes that the 1993 Contract expressly releases Getty from liability for any misuses of Gentieu's images that amounted to copyright infringement.[29]

---

[28] Gentieu offers no justification for such a total change of position, which smacks of the same type of litigation conduct that triggers application of the "mend the hold" doctrine to preclude the later assertion of a new legal position (see, e.g., cases cited in <u>United States v. Newell</u>, 239 F.3d 917, 922 (7th Cir. 2001)).

[29] G. Mem. 56 contends that even if the 1993 Contract immunized Getty from liability for misuse by third parties, it should not be read to excuse Getty's own conduct in authorizing their copyright infringement. She argues that such a broad waiver of copyright liability would be improper under <u>CBS Broadcasting, Inc. v. Primetime 24 Joint Venture</u>, 48 F. Supp.2d 1342, 1360 (S.D. Fla. 1998). But that case concerned waiver by conduct, not waiver by way of an express contractual term.

## 2. Alleged Misconduct by Getty Itself

Gentieu also argues that Getty's own conduct with respect to the licensing of her images exceeded the scope of the 1993 Contract and thus constitutes copyright infringement (in addition to breach of fiduciary duty and breach of contract, addressed in the following sections). Specifically Gentieu complains that Getty (1) allowed reproduction and use of Getty's images in a database and issued licenses after the 1993 Contract terminated, (2) failed to report licenses to Gentieu, discounted prices for her images and cancelled licenses for her images after they were used and (3) licensed images that had not been accepted and licensed images for uses that violated existing restrictions.

Even if Getty's conduct were not actually excused by the limited liability clause, Gentieu's claims of copyright infringement based on such asserted conduct cannot succeed. First, Getty correctly argues that Gentieu's allegations about Getty's post- contract-termination conduct rely on evidentiary materials that were not produced until after the close of discovery and are therefore not properly before this Court. This Court's order for the close of discovery must be taken seriously--here (as always) this Court did not arbitrarily impose that date on the parties, instead allowing the parties to set the

Moreover, there is nothing in the contractual language or context here that would support a basis for treating "loss, damage, or misuse" by Getty any differently from such acts by Getty's customers.

49

pace of their own discovery schedule subject to periodic oversight, with the ultimate close-of-discovery order being entered only on the joint assurance of the parties that the time allowed was ample to the task.

Both for that reason and because of the de minimis nature of the conduct, this Court's August 13, 2002 oral ruling specifically denied Gentieu's motion for additional discovery on one of the issues that it now seeks to raise in response to Getty's Rule 56 motion.[30] Gentieu's attempts to include evidence obtained after the close of discovery in her Rule 56 submissions is thus improper and will not be credited.

Second and in any event, Gentieu's reporting, pricing and cancellation-related conduct did not exceed the scope of the license. To be sure, Gentieu correctly states that when a license is limited in scope, exploitation of the copyrighted work beyond those specified limits constitutes infringement (I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996)). But the license at issue here was exceptionally broad in scope. 1993 Contract ¶2.1 appointed Getty as the "sole and exclusive agent and representative throughout the world with respect to the license, reproduction, use, sale, or other exploitation" of

---

[30] Gentieu did not seek reconsideration of that motion, nor did she submit a Rule 56(f) affidavit indicating the need for further discovery. Nor did she supplement her previous discovery responses to include the charged conduct under Rule 26(e)(2).

Gentieu's images that were accepted by Getty.[31]  Further, 1993
Contract ¶2.5 granted Getty "sole discretion regarding setting
the terms and conditions of any license, reproduction, use, or
other exploitation" for those images.

That being so, as <u>Graham v. James</u>, 144 F.3d 229, 236 (2d
Cir. 1998) has reconfirmed, quoting <u>United States Naval Inst. v.
Charter Communications, Inc.</u>, 936 F.2d 692, 695 (2d Cir. 1991):

> An exclusive licensee of any of the rights comprised in
> the copyright, though it is capable of breaching the
> contractual obligations imposed on it by the license,
> cannot be liable for infringing the copyright rights
> conveyed to it.

So Gentieu's allegations with respect to that conduct must sound
(if at all) in breach of contract (discussed later), not in
copyright infringement.

Lastly, Gentieu points to conduct said to be outside the
scope of the license:  (1) Getty's licensing of images that had
been submitted but not accepted by Getty or had been culled from
its collection and (2) Getty's improper licensing of images for
uses that did not conform to the restrictions on the image when
it was accepted by Getty.  To begin with, some of those
assertions are insufficiently supported by citations to record
evidence (see G. St. ¶¶420, 422).  And as for the licenses of
unaccepted images, Getty consistently accepted payment for those

---

[31]  For use and publication in books and periodicals, the
license was non-exclusive but was equally broad in its grant of
discretion.

licenses without objection. Moreover, once Getty became aware of conflicts in the licensing of restricted images, the issue was resolved in due course, and Gentieu accepted payment for those uses as well (S. R. St. ¶¶310-13). Any claimed damages suffered by Gentieu for such copyright infringement are no better than de minimis and do not call for further treatment here.

To sum up, Getty's copyright liability for misuse of Gentieu's images by third parties is expressly limited by the 1993 Contract. Further, given the discretion granted to Getty with respect to Gentieu's images, Getty's own licensing actions did not exceed the scope of the 1993 Contract. Gentieu's claim of copyright infringement based on the asserted conduct cannot succeed either.

## Breach of Fiduciary Duty

G. R. Mem. 56-68 raises a litany of conduct by Gentieu that she now seeks to characterize as violating Getty's fiduciary duty under the 1993 Contract. Getty counters that Gentieu should be limited in bringing her fiduciary duty claims to the issues raised in her Complaint. Again this Court agrees.

Gentieu shaped her Complaint by advancing only specific allegations under the fiduciary duty heading: that Getty commissioned and accepted baby images from other photographers and then declined, culled, and told Gentieu not to submit similar images. As this Court's January 13, 2003 order details (2003 WL

132513, at *4), Gentieu declined to particularize or recast that claim through the course of discovery, and Getty has justifiably relied on the manner in which Gentieu and her lawyers had characterized the case from the very outset and throughout the massive and painstaking process of preparing the case.

Gentieu had plenty of chances to recast her fiduciary duty claim if she (or her second set of lawyers) thought that was called for, and she cannot do so at this late stage in response to Getty's Rule 56 motion--any more than she could do so when the case had reached and was on trial, a trial for which summary judgment is of course a substitute. This opinion therefore turns to the merits of the fiduciary duty claim as originally identified in Gentieu's Complaint.

Gentieu appointed Getty as her agent with respect to images accepted under the 1993 Contract. That created a principal-agent relationship that placed on Getty a fiduciary duty to treat Gentieu "with the utmost candor, rectitude, care, loyalty, and good faith" (Burdett v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992)). Gentieu argues that Getty violated its duty of loyalty when it induced and participated in the creation of images in "Gentieu's style" by other photographers to take the place of her images in the Getty collection.

Agency law also recognizes, however, that an agent can act on behalf of competing principals without violating its fiduciary

duty where the agent believes that it is privileged to undertake such representation and has disclosed its representation of competitors to the principals involved (Restatement (Second) of Agency §394 cmt. b (1958); accord, 1 I.L.P. Agency §32 at 480 (1988)). It is undisputed that Gentieu was aware that Getty would represent and accept images of babies from multiple photographers (S. St. ¶5). Hence Getty's representation of Gentieu's competitors cannot alone constitute a breach of its fiduciary duty to Gentieu.

Gentieu concedes that Getty could accept and market images that competed with her own, but she contends that Getty violated its duty of loyalty when it actively sought to create and commission images from other photographers to replace images that it had or would have accepted from Gentieu. To that end Getty points to <u>Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.</u>, 281 N.E.2d 142, 145 (N.Y. 1972), which found that although a publisher had a general right to produce competing works that lessened an author's royalties, "there may be a point where the activity is so manifestly harmful to the author, and must have been seen by the publisher so to be harmful, as to justify the court in saying that there was a breach of the covenant to promote the author's work."

But unlike the publishing industry discussed by <u>Van Valkenburgh</u>, the very nature of the stock photography business

requires that the stock agency solicit images <u>on the same subject</u> so that it can offer clients a menu of images to choose from (S. St. ¶¶9, 10, 13). As Gentieu was well aware both before she signed her contract and throughout its duration, Getty solicited images of babies from multiple photographers. In contrast, the publisher in <u>Van Valkenburgh</u>, <u>id</u>. at 43 actively concealed from the plaintiff-author that it had commissioned other authors to create an electronics book similar to the author's best selling work.

Moreover, as opposed to the clear evidence in <u>Van Valkenburgh</u>, there is no evidence in this case that could even arguably raise a reasonable inference that Getty was engaged in such claimed misconduct. Gentieu points to the September 1996 letter that she received from her art director that referred to one of her images in a list of ideas for new images, claiming that it was an invitation to other photographers to copy her images (G. R. Mem. 68). But as stated earlier, that letter was sent only to Gentieu herself, and there is no evidence that her images were identified to any other photographers (S. R. St. ¶37).

Gentieu alludes to only one other piece of evidence: the memorandum from Getty telling her that, among other images, it no longer wanted baby pictures with white backgrounds. But that memorandum was not sent until May 1998, almost two years after

the earlier letter calling for such images, and it contained

three pages worth of ideas for images that Getty did want from

Gentieu (S. R. St. ¶86, S. Ex. 49). No reasonable factfinder

could infer from those bare facts that Gentieu was seeking to

replace Gentieu's baby images. Accordingly, Getty's motion for

summary judgment on Gentieu's fiduciary duty claim is also

granted.

## Breach of Contract

At long last the end is in sight. This opinion must finally

address Gentieu's argument that Getty breached the 1993 Contract

in three different ways: (1) that Getty's purported licensing

improprieties, described above as exceeding the scope of the

license, violated specific provisions of the contract, (2) that

other conduct by Getty breached the contract's "best efforts"

clause and (3) that all of those acts by Getty breached an

implied covenant of good faith and fair dealing.[32] Again the

claims are addressed in turn.

First, Gentieu contends that Getty's licensing conduct that

exceeded the scope of the 1993 Contract constituted a breach of

that document. Essentially for the same reason as stated

earlier, Gentieu's breach of contract claim with regard to

---

[32] Gentieu's other contractual claim (relating to unpaid
license fees) has been resolved earlier, with Getty having
acceded to Gentieu's figures and having made payment in the full
amount claimed to avoid further prolonged litigation in that
respect.

misuses by Getty's customers fails as a matter of law. It will be recalled that 1993 Contract ¶6.2 granted Getty "full and complete authority" to make claims against third party infringers and "sole and complete discretion" for "[a]ll settlement decisions of any nature." By definition, then, Getty's noninitiation of lawsuits to enforce Gentieu's copyrights does not constitute a contractual breach. While Getty is obligated to "make a reasonable attempt" to recover for misuses where compensation "can be obtained," all of the evidence shows that it has done just that. Upon learning of each of the unauthorized uses cited by Gentieu (G. St. ¶¶315-17), Getty resolved the issue by negotiating retroactive licenses and paying Gentieu her portion of those retroactive fees.

Any potential liability for breach with respect to alterations to Gentieu's images is further limited by express contractual terms. 1993 Contract ¶2.5 (emphasis added) gave Getty the "sole discretion regarding setting the terms and conditions of any license, reproduction, use, or <u>other exploitation</u> of the Images <u>without the need for any prior consultation with the Contributor</u>." So even if there had been evidence that Getty authorized the accused alterations in the license for Gentieu's images (and there was not[33]), nothing in

_____

[33] Whether or not the image modifications listed by Gentieu (G. St. ¶¶354-61) actually constituted unlawful derivative works, Gentieu's allegations that Getty authorized those changes to her work is unsupported by any citation to the record. Gentieu's

the 1993 Contract obligated Getty to seek Gentieu's approval.[34]

Moreover, Getty included, among the standard terms and conditions on the back of the licenses to its customers, this provision: "Alterations in TSI images are only allowed where not specifically prohibited by a TSI photographer." There is no indication that Gentieu specified that her images that were accepted into Getty's collection could not be altered by Getty's customers for their own uses.

All but one of Gentieu's further allegations that Getty's conduct breached specific contractual provisions are patently untenable. In claiming breach she points to 1993 Contract ¶¶7.1 and 7.4, provisions requiring Getty to advise Gentieu of sales and indicating her share of the licensing fees. But those terms are plainly inapplicable to most of the complained-of conduct-- and, moreover, other unambiguous language in the 1993 Contract granted Getty unfettered authority to license the use, reproduction and exploitation of Gentieu's images (S. Ex. 7 ¶2.1)

_____

supporting exhibit for those allegations (G. Ex. 107) attaches only the images themselves and does not include the licenses or any evidence that Getty knew the changes would be made. Those licenses for the challenged uses that are provided by Getty (S. Ex. 41) contain nothing that would have indicated to Getty that the images would be cropped or altered.

[34] That Getty did seek her permission on a few occasions (G. St. ¶353) does not create an obligation that overrides the express discretionary terms of the 1993 Contract. In addition, Gentieu's reference to the 1998 Contract and her quotation of the 1993 newsletter that referred to seeking permission for combining images from different photographers are similarly unconvincing.

and set licensing terms as it saw fit (id. at ¶2.5).

Gentieu's single arguably viable claim is that Getty's failure to report licensed uses to her violated 1993 Contract ¶7.4, which required Getty to advise Gentieu of sales of her images. Getty does not dispute that some mistakes were made in the reporting of licenses, but it has shown that it attempted to pay Gentieu for such unreported licenses once they were located, and that Gentieu then refused payment. With those licenses having been reported to Gentieu and with her having chosen to reject the proffered payments, she cannot claim damages from the initial failures to report.

Second, Gentieu contends that various aspects of Getty's conduct violated its contractual "best efforts" clause. 1993 Contract ¶6.1 obligates Getty to "use its best efforts to license the Images and to maximize the overall earnings received by TSI for same." Gentieu challenges a number of Getty's asserted acts under that clause: failure to market her images electronically, withholding of contract renegotiation information, obstruction of her audit, withholding of payments, pricing, cancellation and restriction of her images, and participation in the creation of images in Gentieu's style by other photographers.

Getty responds in the first instance that the best efforts clause is unenforceable under Illinois law. Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1440-41 (7th Cir. 1992),

59

analyzing the line of Illinois cases addressing the issue,
concluded that although Illinois courts have not categorically
rejected best efforts clauses, such clauses have not been
enforced when the contract has failed to set out the level of
performance required by the phrase. Where the contract contains
no additional language specifying the level of exertion required,
a best efforts clause is too vague and indefinite to be enforced
as a matter of law (id.; see also GLS Dev., Inc. v. Wal-Mart
Stores, Inc., 944 F. Supp 1384, 1392 (N.D. Ill. 1996)). As in
those cases, neither the best efforts clause itself nor any other
terms of the 1993 Contract provide any standards of performance
by which Getty's efforts could be measured or evaluated.

Gentieu concedes that best efforts clauses have not
generally been enforced in Illinois but replies that the clause
at issue here is not unduly vague in light of the structure and
context of the 1993 Contract. She argues that the clause should
be held enforceable because of the exclusive nature of the
license, citing Wood v. Lucy, Lady Duff-Gordon, 118 N.E. 214, 214
(N.Y. 1917) and Bidlack v. Wheelabrator Corp., 993 F.2d 603, 607
(7th Cir. 1993)(en banc).

Wood, 118 N.E. at 214-15 held that an exclusive licensing
arrangement did not fail for lack of mutuality because the
licensee had an implied obligation to use reasonable efforts to
promote the licensor's work. Discussing Wood as an example of

contract interpolation, Bidlack, 993 F.2d at 607 explained that
by granting an exclusive license to market her work, the licensor
"had delivered herself into her licensee's power, for unless he
had a contractual obligation to market her designs he could
threaten to sit on the license and do nothing unless she
increased his compensation." Analogizing the agreement in Wood
to Getty's exclusive license for her images, Gentieu contends
that the best efforts clause should be read as imposing on Getty
a like obligation to use good faith, reasonable efforts to market
her images.

Although Gentieu cites no Illinois caselaw for her position,
Illinois courts have generally implied a best efforts obligation
"only if it is necessary to prevent the contract from failing for
lack of mutuality or to otherwise achieve the clear intentions of
the parties derived from their express agreement" (Beraha, 956
F.2d at 1442). Beraha, id. declined to imply such an obligation
to the exclusive license there because an advance royalty payment
to the licensor constituted independent consideration for the
agreement (see also Permanence Corp. v. Kennametal, Inc., 908
F.2d 98, 102 (6th Cir. 1990)). But here as in Wood, Gentieu's
compensation for images accepted under the contract was
completely dependent on Getty's sales of those images, and her
share of the licensing fees was the only consideration for her
exclusive grant of authority to Getty.

61

Under such circumstances this Court views Illinois law as imposing an obligation on Getty to use good faith, reasonable efforts to promote Gentieu's images. Hence the best efforts clause in the 1993 Contract is enforceable as an express articulation of that otherwise implied obligation. Gentieu's challenges to Getty's complained-of conduct will be measured against that yardstick, despite the language's lack of precise measurement.

To begin with, as indicated in n. 31, Getty has already paid Gentieu the full amount of her requested damages for her claims of withheld payments and obstruction of her audit. Those claims have been dismissed by this Court's January 13, 2003 order (2003 WL 132513, at *4).

Further, the portion of Gentieu's breach of contract claim that echoes her rejected breach of fiduciary duty claim fails for the reasons discussed earlier. Getty did not breach its best efforts obligation by representing multiple baby photographers, and Gentieu has failed to raise any reasonable inference that Getty undertook a campaign to create or commission images by other photographers in an effort to replace the Gentieu images in the Getty collection.

Getty is also correct in contending that another of Gentieu's claims--that Getty assertedly withheld contract information from Gentieu that it shared with members of the

PAG--is both unsupported by admissible evidence and irrelevant to her breach of contract claim. There is much evidence in the record that Gentieu was actually kept abreast of PAG activities and was aware as early as July 1997 that PAG was involved with the terms of a new photographer agreement (S. R. St. ¶¶102-10). Gentieu's assertion of secrecy in the process is supported only by anonymous e-mails from an internet message board that are inadmissible hearsay evidence.[35] Moreover, Getty's sharing of information with PAG cannot tenably be construed as a breach of its obligation to promote Gentieu's work.

Gentieu's claims that Getty breached the best efforts clause by licensing her images at discount prices, authorizing licensing restrictions and allowing cancellations also fail as a matter of law. Under Illinois law, best efforts clauses (even when express rather than just implied) may aid courts in the construction of ambiguous contract provisions, but they cannot be read to override or modify the express meaning of other contract terms (Coleman v. Madison Two Assocs., 307 Ill.App.3d 570, 578, 718 N.E.2d 668, 675 (1st Dist. 1999)). And although Getty was obligated to use its best efforts in promoting Gentieu's images,

---

[35] Gentieu argues in her response to Getty's motion to strike that statements by PAG members come into evidence as admissions by an agent of a party opponent under Fed. R. Evid. 801(d)(2)(D). But that contention is insupportable, for there was no agency relationship between PAG and Getty. Nor, indeed, would such e-mails appear to qualify as statements that would fit within that evidentiary rule in any event.

1993 Contract ¶2.5 expressly vested Getty with "sole discretion" in setting the terms and conditions of the licenses. That clause is unambiguous. So despite any enforcebility of the best efforts clause as such, Gentieu cannot claim that the way Getty set terms or conditions of its licenses breached the 1993 Contract (<u>Wright-Moore Corp. v. Ricoh Corp.</u>, 980 F.2d 432, 437 (7th Cir. 1992)).

Gentieu's claim that Getty breached the best efforts clause by failing to market her images digitally on its website[36] fails for the same reason. Getty did not have a website when Gentieu signed the 1993 Contract, and Gentieu concedes that Getty was under no obligation to create one (S. R. St. ¶181). Gentieu argues nonetheless that once Getty later developed a website, it had an obligation under the best efforts clause to include her images on the web, even though she did not sign the 1998 Contract that specifically addressed and allocated the costs of licensing on-line images.

But 1993 Contract ¶2.4 (emphasis added) likewise gave Getty "the right and <u>sole discretion</u> to reproduce and use any of the

---

[36] Gentieu also argues that Getty failed to make many of her images available on its internal searchable database. But once again she fails to attach supporting documentation on which she seeks to rely. Her claim that her images were incorrectly keyworded within the Compass system is put forth only via a manufactured exhibit (G. Ex. 41) of unsupported testimony, combined with her audit notes that do not provide evidence of the search that she performed or the system settings at the time of the search (S. R. St. ¶232). Moreover, the undisputed testimony of the director of Getty's keyword system was that the printing "bug" in the system would not affect Compass search results (S. R. St. ¶237).

Images in catalogs, advertisements and promotional materials of TSI&A in <u>any and all mediums</u> throughout the world." That provision goes on to state that <u>if</u> a photographer's images were included in a catalog, the photographer would share in any publishing costs. Although Gentieu claims that Getty made later promises to put her images on the website, she fails to provide necessary supporting documentation for those promises (G. St. ¶¶46, 49, 101)--and more importantly, any such statements lack independent consideration to supplant the "sole discretion" provided for in the integrated 1993 Contract (S. Ex. 7 ¶12.7). Because the express terms of the 1993 Contract were unambiguously at odds with any claimed obligation to put any of Gentieu's images on the web, Getty's failure to do so cannot constitute a breach of its best efforts obligation (<u>Wright-Moore</u>, 980 F.2d at 437).

Finally, Gentieu claims that all of Getty's conduct raised in all of her other claims breached its implied covenant of good faith and fair dealing. While Illinois law recognizes that such a covenant is implied in every contract, it does not constitute an independent source of duties to the parties of a contract, but rather guides the construction of explicit and ambiguous terms in a contract (<u>Beraha</u>, 956 F.2d at 1443). Although for that purpose the implied covenant can come into play when one party to the contract is given broad discretion in performance (<u>id</u>.), that

65

role is a limited one--as <u>Northern Trust Co. v. VIII S. Mich.</u> <u>Assocs.</u>, 276 Ill.App.3d 355, 367, 657 N.E.2d 1095, 1104 (1st Dist. 1995) explains:

> Parties to a contract, however, are entitled to enforce the terms of the contract to the letter and an implied covenant of good faith cannot overrule or modify the express terms of a contract.

So the same reasons that have been stated earlier preclude the unambiguous terms of the 1993 Contract from being nullified by the implied covenant of good faith and fair dealing. This last claim by Gentieu cannot stand either.

Once more by way of summary, none of the conduct about which Gentieu has complained constitutes a breach of the 1993 Contract. Accordingly Getty's motion for summary judgment on Gentieu's breach of contract claims is granted as well.

### Conclusion

What this opinion voiced by way of criticism below the * * * divider in its subsection on <u>Digital Compilations</u> could have been repeated at numerous other stages of the discussion--and it certainly merits recall here. Although Gentieu had a legitimate claim for unpaid royalties under the 1993 Contract when this lawsuit was instituted, it is one that could have been resolved long since--and without the enormous expenditure (really a waste) of resources that has ensued[37]-- if

---

[37] In that respect, quite apart from the vast amount of detail in the bulky exhibits comprising photographs and other supporting materials, the size of the parties' memoranda can best

she had not coupled that claim with contentions obviously
ascribable to an overexaggerated sense of self-importance.

At the end of the day, however, that attempt at self-
aggrandizement has failed entirely.  No genuine issue of material
fact preserves any of Gentieu's myriad claims against an adverse
judgment as a matter of law.  Getty's Rule 56 motion is granted
in its entirety, and this action is dismissed.[38]

_Milton I. Shadur_
Milton I. Shadur
Senior United States District Judge

Date:  March 26, 2003

---

be labeled as staggering:

      1.  Getty's initial memorandum ran 83 pages.
      2.  Gentieu responded with 72 pages of text.
      3.  Because the nature of that response really expanded
the dispute materially (Gentieu's accompanying G. .St. was a
562 paragraph (!!) declaration), Getty quite understandably
found it necessary to submit a 69 page reply memorandum.

[38]  It should be obvious from the very scope and structure
of this opinion that it owes a great deal to the outstanding work
by this Court's excellent law clerk, Stephanie Weiner, in
generating a draft opinion that organized the litigants'
sprawling submissions into an orderly presentation and then
applied a keen analysis to the legal issues involved.  Although
every other opinion for which Ms. Weiner has provided input also
qualifies for high praise, the nature of this case and her work
product certainly merit special mention.  Having said that, this
Court hastens to add that if any errors have nevertheless found
their way into this opinion, they are ascribable to this Court
and not to Ms. Weiner--this Court has followed its invariable
practice of parsing each draft by one of its law clerks word by
word and sentence by sentence, so that the responsibility for the
end product must be placed at this Court's doorstep.



Gentieu 968191-001      Vincent Oliver BB2449-003

**Exhibit 1**